# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

**MARK COLLINS o/b/o M.D.C.,**  )
    Plaintiff  )
      )
v.  )    Civil Action No. 2:12cv00016
      )  **REPORT AND RECOMMENDATION**
**CAROLYN W. COLVIN,**[1]  )
**Commissioner of Social Security,**  )  By:  PAMELA MEADE SARGENT
    Defendant  )    United States Magistrate Judge
      )

Plaintiff, Mark Collins, on behalf of his minor daughter, M.D.C., filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying M.D.C.'s claim for children's supplemental security income, ("SSI"), benefits under Title XVI of the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 1381-1383d. (West 2012 & Supp. 2013). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Collins protectively filed an application for children's SSI on behalf of his daughter on September 23, 2008, alleging disability as of May 1, 2005, due to seizures, sleeping problems, anxiety, mood swings and fatigue. (Record, ("R."), at 146-48, 183, 200, 207, 222.) Collins's claim was denied initially and on reconsideration. (R. at 80-82, 86, 89-91.) Collins then requested a hearing before an administrative law judge, ("ALJ"), (R. at 93-94). The hearing was held on February 15, 2011, at which he was represented by counsel. (R. at 33-73.)

By decision dated February 25, 2011, the ALJ denied Collins's claim. (R. at 12-27.) The ALJ found that M.D.C. was born in 1997, and, therefore, was a school-age child on September 23, 2008, the date the application was filed, and was then currently an adolescent. (R. at 15.) The ALJ found that M.D.C. had not performed any substantial gainful activity since September 23, 2008, the application date. (R. at 15.) The ALJ found that the medical evidence established that M.D.C. suffered from severe impairments, namely "absence" seizures, right knee genus valgus deformity, status post arthroscopic surgeries and obesity, but he found that M.D.C. did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ further found that M.D.C. did not have an impairment or combination of impairments which would result in marked and severe functional limitations. (R. at 15-26.) Therefore, the ALJ concluded that

M.D.C. was not under a disability as defined by the Act and was not eligible for children's SSI benefits. (R. at 27.) *See* 20 C.F.R. § 416.924(d)(2) (2013); *see also* 42 U.S.C.A. § 1382c(a)(3)(C)(i) (West 2012).

After the ALJ issued his decision, Collins pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-5.) Collins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2013). The case is before this court on Collins's motion for summary judgment filed January 25, 2013, and the Commissioner's motion for summary judgment filed February 25, 2013.

## *II. Facts*

M.D.C. was born in 1997. (R. at 200.) At the hearing, M.D.C. testified that she had undergone five knee surgeries, two to her left knee and three to her right knee. (R. at 43.) She stated that Dr. Kotay limited her physical education activity to no running. (R. at 42.) M.D.C. stated that she was enrolled in special education classes and regular classes. (R. at 51-52.) She stated that she was making the honor roll. (R. at 52.) M.D.C. stated that her plan was to graduate from high school and to attend college to become a registered nurse. (R. at 53.) M.D.C. stated that she experienced mild pain in her right knee when walking. (R. at 53.) Collins also testified at the hearing. (R. at 58-61.) He stated that M.D.C.'s absence seizures usually lasted between two to five seconds. (R. at 58.) He stated that M.D.C. would become confused after she experienced an absence seizure. (R. at 58.)

Medical expert, Dr. H.C. Alexander, III,[2] M.D., also testified at Collins's hearing. (R. at 62-73.) Dr. Alexander stated that M.D.C. had three main impairments consisting of right knee problems, obesity and absence seizures. (R. at 67.) He stated that these impairments, either alone or in combination, did not meet or equal any of the listings of child impairments. (R. at 67, 70.) Dr. Alexander stated that he found no limitations on M.D.C.'s ability to acquire and use information, to attend and complete tasks and to interact and relate with others, stating that her school grades did not indicate limitations in these areas. (R. at 68.) He stated that M.D.C.'s ability to move about was less than markedly impaired because of her body mass index and her restriction on running. (R. at 69.) He found no limitation in her ability to care for herself. (R. at 69.) Dr. Alexander found that M.D.C. had a less than marked impairment in her health and physical well-being in that she had not been compliant with her medication or in her ability to lose weight. (R. at 69.) Dr. Alexander stated that one of the requirements needed to meet listing 101.02 is the inability to ambulate effectively as defined in 101.00B2(b). (R. at 72.) He stated that there was no real supporting evidence to show that M.D.C. met that requirement. (R. at 72.) He found that she could negotiate stairs, that she was able to get back and forth to her classes and that she did not require an assistive device. (R. at 72.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; University of Virginia Health System; Dr. A. M. Vedha, M.D.; Mountain View Regional Medical Center; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Joseph Duckwall, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Norton Community Hospital;

---

[2] Collins's attorney objected to Dr. Alexander's testimony because he was only board-certified in internal medicine and rheumatology and not an orthopedic specialist. (R. at 61.)

Wellmont Bristol Regional Medical Center; and Dr. S. C. Kotay, M.D., an orthopedist. Collins's attorney submitted additional medical reports from University of Virginia Medical Center; Dr. Bernard Manatu, M.D.; Mountain View Hospital; and Dr. Kotay to the Appeals Council.[3]

On April 25, 2006, Susan Taylor Mullins, Ed.S., a school psychologist, evaluated M.D.C. to help clarify M.D.C.'s then-current level of functioning and eligibility for special education services. (R. at 314-17.) The Wechsler Intelligence Scale for Children, Fourth Edition, ("WISC-IV"), was administered, and M.D.C. obtained a full-scale IQ score of 84±3, placing her in the low average range of intelligence. (R. at 315.) The Conner's ADHD Rating Scale, separately completed by M.D.C.'s then-current classroom teacher and her parents showed a clinical elevation in the area of inattention only. (R. at 317.)

In February 2007, Carlotta Steele, M.D.C.'s fourth grade teacher, reported that M.D.C. had trouble attending and concentrating. (R. at 308.) She reported that M.D.C. was easily distracted and had poor retention skills. (R. at 308.) Steele reported that M.D.C.'s seizures had become more frequent and longer in duration. (R. at 308.) She reported that some of M.D.C.'s seizures lasted approximately 45 to 50 seconds, and she could have 10 to 15 in one hour. (R. at 308.)

In May 2009, Susie Wooten, M.D.C.'s special education teacher, completed a Teacher Questionnaire indicating that M.D.C. was on the fourth-grade reading level and the third-grade level in math and written language. (R. at 249-54.) She

---

[3] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

indicated that M.D.C. had difficulty acquiring and using information. (R. at 250.) Wooten indicated that M.D.C. had "a slight problem" comprehending and following oral instructions; understanding school and content vocabulary; reading and/or comprehending written material; providing organized oral explanations and adequate descriptions; and applying problem solving skills in class discussions. (R. at 250.) She indicated that M.D.C. had "an obvious problem" with comprehending and doing math problems; expressing ideas in written form; learning new material; and recalling and applying previously learned material. (R. at 250.) Wooten reported that M.D.C. had no problem understanding or participating in class discussions, interacting and relating with others, moving about and manipulating objects or caring for herself. (R. at 250-53.) Although Wooten indicated that M.D.C. had no problem in caring for herself, she did note that M.D.C. had "a serious problem" with "taking care of personal hygiene." (R. at 253.)

An October 2005 electroencephalography, ("EEG"), first documented M.D.C.'s history of absence seizures[4] for which M.D.C. was evaluated at the University of Virginia Health System, ("UVA"). (R. at 309, 395-96.) It was reported that M.D.C. was often confrontational and disobedient to her parents, somewhat oppositional or argumentative with her teachers and that she had been fighting with other children. (R. at 395.) Dr. Nathan Fountain, M.D., reported that he doubted that the seizures were substantially contributing to M.D.C.'s behavior, but could be contributing to her poor school performance. (R. at 397.) He diagnosed typical absence seizures. (R. at 396.) On August 9, 2006, M.D.C.'s mother reported that her seizures were well-controlled until M.D.C. had knee

---

[4] An absence seizure is an epileptic seizure marked by a momentary break in the stream of thought and activity, accompanied by a symmetrical 3-c.p.s. spike and wave activity on the EEG. Absence seizures are also referred to as petit mal seizures. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1503 (27th ed. 1988).

surgery. (R. at 386-87.) On October 11, 2006, it was reported that M.D.C. continued to experience up to 20 seizures a day. (R. at 384.) On April 11, 2007, it was reported that medication had resulted in control of M.D.C.'s absence seizures. (R. at 380-81.) Her school performance had stabilized. (R. at 380.) On August 1, 2007, M.D.C. and her mother both reported complete resolution of seizures. (R. at 378.) M.D.C. was tolerating her medication well, and neurological examination was normal. (R. at 378.) On January 9, 2008, it was again reported that M.D.C.'s school performance continued to improve, and she remained seizure-free. (R. at 376-77.) However, on August 13, 2008, M.D.C. had developed problems with medication compliance and, as a result, multiple absence seizures had been observed. (R. at 374.)

On January 26, 2009, Dr. Richard M. Surrusco, M.D., a state agency physician, reported that M.D.C. suffered from a severe impairment, namely absence seizures, but that her impairment did not meet or equal a listing. (R. at 415-20.) Dr. Surrusco found no limitation in M.D.C.'s ability to acquire and use information, to attend and complete tasks, to interact and relate with others, to move about and manipulate objects and to care for herself. (R. at 417-18.) He found that M.D.C. had a less than marked limitation in the ability to care for her health and physical well-being. (R. at 418.)

On May 28, 2009, Julie Jennings, Ph.D., a state agency psychologist, reported that M.D.C. suffered from a severe impairment, namely absence seizures. (R. at 427-33.) She found that M.D.C. had a less than marked limitation in the ability to acquire and use information and to care for her health and physical well-being. (R. at 430-31.) Jennings noted no limitation in her ability to attend and

complete tasks, to interact and relate with others, to move about and manipulate objects and to care for herself. (R. at 430-31.)

On August 5, 2009, M.D.C.'s mother reported that M.D.C. was tolerating her medication well and that she was seizure-free. (R. at 435, 500-01.) During her last visit, there were concerns of nocturnal events, such as groaning and foot kicking, but an EEG was normal. (R. at 435, 500, 568-69.) Neurological examination was normal. (R. at 501.)

In December 2009, M.D.C. fell in gym class and experienced right knee pain. (R. at 477-80.) X-rays showed a large osteochondral defect of the medial femoral condyle with secondary arthropathy. (R. at 479.) An emergency room physician recommended an MRI and referred M.D.C. to an orthopedic specialist. (R. at 480.) A January 2010 MRI of the right knee revealed a flipped lateral meniscus, a small focal body contusion and joint effusion. (R. at 449-51.) A meniscal tear was suspected. (R. at 451.) Dr. S.C. Kotay, M.D., an orthopedist, examined M.D.C. and noted minimal valgus deformity[5] in the left knee and moderate valgus deformity in her right knee. (R. at 579-84.) On February 1, 2010, Dr. Kotay performed an arthroscopic partial lateral meniscectomy on M.D.C.'s right knee. (R. at 476.) Radiologic reports in February and March 2010 still showed valgus of the right leg and osteochondritis dissecans[6] of the lateral femoral condyles of both knees. (R. at 470-73.)

---

[5] A valgus deformity is a term for outward angulation of the distal segment of a bone or joint. A valgus deformity of the knee is when the tibia is turned outward in relation to the femur, resulting in a knock-kneed appearance. *See* http://wikipedia.org/wiki/Valgus_deformity (last visited Aug. 1, 2013).

[6] Osteochondritis dissecans refers to osteochondritis resulting in the splitting of pieces of cartilage into the joint, particularly the knee joint or shoulder joint. *See* Dorland's at 1198.

On March 30, 2010, M.D.C. was seen at UVA, stating that she experienced a couple of absence seizures a month. (R. at 498-99.) She also reported medication noncompliance, stating that she was "tired of taking medications." (R. at 498-99.) Neurological examination was normal. (R. at 498-99.) M.D.C. weighed 124.4 pounds, and her blood pressure reading was 154/76. (R. at 498.) It was recommended to M.D.C.'s mother that she discuss M.D.C.'s obesity with her pediatrician because it had already started causing her problems, such as knee problems and high blood pressure. (R. at 499.)

In July 2010, Dr. Mark Romness, M.D., an orthopedist, examined M.D.C. for pain and catching in her right knee. (R. at 495-97.) Dr. Romness noted mild tenderness to palpation and valgus deformity and recommended surgery to repair the lateral distal femur on the right. (R. at 496-97.) On September 2, 2010, Dr. Romness performed a successful right knee arthroscopy with removal of loose body and shaving chondroplasty, as well as right distal femoral valgus osteotomy with internal fixation and bone graft. (R. at 489-91.) During a follow-up appointment on October 4, 2010, M.D.C. was full-weight bearing and ambulating without a brace. (R. at 488.) Dr. Romness reported excellent recovery. (R. at 488.) He wrote a note ordering M.D.C. to not participate in physical education classes until December 1, 2010. (R. at 488.)

On January 5, 2011, M.D.C. reported medication compliance and that she was seizure-free. (R. at 572.) She weighed 279 pounds. (R. at 572.) She was diagnosed with well-controlled idiopathic generalized epilepsy. (R. at 572.)

On February 9, 2011, Dr. Kotay provided a medical source statement stating that he "feel[s] that [M.D.C.]'s condition meets or at least equals medical listing 101.02, Subsection A." (R. at 586.) Dr. Kotay did not provide any explanation for his opinion. (R. at 586.)

## III. Analysis

A child is considered disabled for SSI purposes only if the child suffers from a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and which lasts for a period of not less than 12 months. 42 U.S.C.A. § 1382c(a)(3)(C)(i). The Commissioner uses a three-step process in evaluating children's SSI claims. *See* 20 C.F.R. § 416.924 (2013). This process requires the Commissioner to consider, in order, whether the child 1) is engaged in substantial gainful employment; 2) has a severe impairment; and 3) has an impairment that meets or equals, either medically or functionally, the requirements of a listed impairment. *See* 20 C.F.R. § 416.924. As with the process for adults, if the Commissioner finds conclusively that a child is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.924. Thus, under the applicable regulations, an ALJ may find a child to be disabled within the meaning of the Social Security Act only if he finds that the child has a severe impairment or combination of impairments that meets or equals an impairment listed in Appendix 1. *See* 20 C.F.R. §§ 416.924(c)-(d) (2013).

By decision dated February 25, 2011, the ALJ denied Collins's claim. (R. at 12-27.) The ALJ found that M.D.C. had not performed any substantial gainful activity. (R. at 15.) The ALJ found that the medical evidence established that M.D.C. suffered from severe impairments, namely "absence" seizures, right knee

genus valgus deformity, status post arthroscopic surgeries and obesity, but he found that M.D.C. did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ further found that M.D.C. did not have an impairment or combination of impairments which would result in marked and severe functional limitations. (R. at 15-26.) Therefore, the ALJ concluded that M.D.C. was not under a disability as defined by the Act and was not eligible for children's SSI benefits. (R. at 27.) *See* 20 C.F.R. § 416.924(d)(2); *see also* 42 U.S.C.A. § 1382c(a)(3)(C)(i).

In his brief, Collins argues that the ALJ failed to have a proper medical expert to testify at the hearing as to the severity of M.D.C.'s impairments. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.) Collins also argues that the ALJ erred by failing to find that M.D.C. meets or equals the criteria for the listing of a major dysfunction of a joint(s) found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 101.02. (Plaintiff's Brief at 5-8.) Collins does not challenge the ALJ's finding that M.D.C. had no marked limitations in any of the six domains of functioning.[7]

As stated above, the court must determine if there is substantial evidence in the record to support the ALJ's decision that M.D.C. was not under a disability as

---

[7] A child functionally equals a listing when her impairment is of listing level severity, i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. *See* 20 C.F.R. § 416.926a(a) (2013). The six domains that are considered in the functional comparison are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; (6) and health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1) (2013).

defined in the Act. If substantial evidence exists to support this finding, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws*, 368 F.2d at 642. Also, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). "Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if [her] decision is supported by substantial evidence." *Hays*, 907 F.2d at 1456.

Although Collins does not challenge the ALJ's finding that M.D.C. had no marked limitations in any of the six domains of functioning, Susie Wooten, one of M.D.C.'s teachers reported in May 2009 that M.D.C. had difficulty acquiring and using information and that she had a "slight problem" comprehending and following oral instructions, understanding school and content vocabulary, reading and/or comprehending written materials, providing organized oral explanations and adequate descriptions and applying problem solving skills in class discussions. (R. at 250.) She reported that M.D.C. had "an obvious problem" with comprehending and doing math problems, expressing ideas in written form, learning new material and recalling and applying previously learned material. (R. at 250.) Wooten reported that M.D.C. had no problem interacting and relating with others, moving about and manipulating objects or caring for herself, with the exception of taking care of personal hygiene, which she found to be "a serious problem." (R. at 251-53.) However, in January 2011, M.D.C. was on the honor roll. (R. at 572.) The record indicates that when M.D.C. is compliant with her medication, her school performance improved and stabilized. (R. at 376, 380, 435.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v.*

*Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, at the hearing, M.D.C. testified that she was making the honor roll and that she planned to attend college to become a registered nurse after graduating high school. (R. at 52-53.)

Medical expert, Dr. Alexander, also testified at M.D.C.'s hearing and stated that he found no limitations with M.D.C.'s ability to acquire and use information, to attend and complete tasks and to interact and relate with others, stating that her school grades did not indicate limitations in these areas. (R. at 68.) He stated that M.D.C.'s limitation on her ability to move about was less than marked because of her body mass index and her restriction on running. (R. at 69.) Dr. Alexander testified that M.D.C. had no limitation in her ability to take care of herself. (R. at 69.) He stated that M.D.C. had a less than marked impairment in her ability to care for her health and physical well-being in that she had not been compliant with her medication or in her ability to lose weight. (R. at 69.) Dr. Alexander stated that one of the requirements needed to meet listing 101.02 was the inability to ambulate effectively, and there was no supporting evidence to show that M.D.C. met that requirement. (R. at 72.) He found that she could negotiate stairs, that she was able to get back and forth to her classes and that she did not require an assistive device. (R. at 72.)

In January 2009, state agency physician, Dr. Surrusco reported that he found no limitation in M.D.C.'s ability to acquire and use information, to attend and complete tasks, to interact and relate with others, to move about and manipulate objects and to care for herself. (R. at 417-18.) He found that M.D.C. had a less than marked limitation on her ability to care for her health and physical well-being. (R. at 418.)

In May 2009, state agency psychologist Jennings reported that M.D.C. had a less than marked limitation on her ability to acquire and use information and to care for her health and physical well-being. (R. at 430-31.) She found no limitation in M.D.C.'s ability to attend and complete tasks, to interact and relate with others, to move about and manipulate objects and to care for herself. (R. at 430-31.)

Based on this, I find that substantial evidence exists to support the ALJ's finding that M.D.C. had no marked limitations in any of the six domains of functioning.

Collins also argues that the ALJ erred by failing to find that M.D.C. meets or equals the criteria for the listing of a major dysfunction of a joint(s) found at § 101.02. (Plaintiff's Brief at 5-8.) To meet or medically equal this listing, M.D.C. must demonstrate a functional loss defined as an inability to ambulate effectively on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 101.00B (2013). Specifically, M.D.C. must demonstrate a "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." With:

    A.    Involvement of one major peripheral weight-bearing joint, i.e., hip, knee or ankle, resulting in inability to ambulate effectively, as defined in 101.00B2b; or

    B.    Involvement of one major peripheral joint in each upper extremity, i.e., shoulder, elbow or wrist-hand, resulting in

inability to perform fine and gross movements effectively, as defined in 101.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 101.02 (2013).

The listing generally defines "ineffective ambulation" as "having insufficient lower extremity functioning … to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 101.00B2b1 (2013). Examples of ineffective ambulation for older children include, but are not limited to: "the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out age-appropriate school activities independently, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 101.00B2b3 (2013).

In September 2010, Dr. Romness observed that M.D.C. was doing very well after her right knee arthroscopy and discharged her with toe-touch weight-bearing with crutches on the right. (R. at 489-91.) In October 2010, Dr. Romness reported that M.D.C. was comfortable ambulating without a brace and was full weight-bearing. (R. at 488.) He recommended that M.D.C. use one crutch for one week and then none after that. (R. at 488.) He also ordered that M.D.C. not participate in physical education classes until December 2010. (R. at 488.) Dr. Romness reported excellent recovery. (R. at 488.) At the hearing, M.D.C. testified that she returned to physical education classes in December 2010. (R. at 41.) She also testified that she performed household chores, such as cleaning and laundry. (R. at 55.) Dr. Alexander testified that M.D.C. did not require any assistive device to ambulate and that she could get to and from her classes without any problems. (R. at 18, 72.)

Although treating orthopedic surgeon, Dr. Kotay, who last treated M.D.C. in July 2010, opined that M.D.C. met or equaled Listing 101.02A, he failed to provide any explanation for or specific findings to support his conclusion. (R. at 586.) Collins asserts that the ALJ should have contacted Dr. Kotay for clarification. (Plaintiff's Brief at 7-8.) The ALJ had Dr. Kotay's treatment reports, as well as other treatment records from Dr. Romness, Dr. Quigg and Dr. Fountain. The ALJ also had the opinion of Dr. Alexander. Given this evidence, I find that there was no need for further clarification from Dr. Kotay. I find that substantial evidence exists to support the ALJ's finding that M.D.C.'s impairments did not meet or equal the listing for § 101.02.

I find Collins's argument that the ALJ erred by failing to have a proper medical expert testify at the hearing unpersuasive. (Plaintiff's Brief at 5.) Collins argues that because Dr. Alexander is not an orthopedic specialist, his testimony should be deemed irrelevant and dismissed. (Plaintiff's Brief at 5.) Dr. Alexander is a licensed physician and is board-certified in rheumatology and internal medicine. (R. at 128-31.)  According to the regulations, an ALJ may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments and on whether such impairments equal the requirements of any listed impairment.  *See* 20 C.F.R. § 416.927(e)(2)(iii) (2013).  The purpose of a medical expert opinion is to explain the significance of clinical findings when the ALJ believes that a medical expert may be able to explain the findings and assist him in assessing their clinical significance. Dr. Alexander provided such testimony. (R. at 62-73.)

Based on this, I find that substantial evidence exists to support the ALJ's

finding that there was no indication that M.D.C.'s impairments functionally equaled a listed impairment or that she had marked limitations in any of the six domains of functioning. I also find that substantial evidence exists to support the ALJ's finding that M.D.C. was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's finding that M.D.C. had no marked limitations in any of the six domains of functioning;

2. Substantial evidence exists to support the Commissioner's finding that M.D.C.'s impairments are not functionally equivalent to a listed impairment; and

3. Substantial evidence exists to support the Commissioner's finding that M.D.C. was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Collins's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     August 6, 2013.


s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE